*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-FS-513

IN RE Z.W.;
M.W., APPELLANT.

Appeal from the Superior Court
of the District of Columbia
(NEG-390-16)

(Hon. Julie Breslow, Magistrate Judge)
(Hon. Steven Wellner, Associate Judge)

(Argued January 23, 2019      Decided August 29, 2019)

*Rosemarie Ricchiuto* for appellant M.W.

*Pamela Soncini*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for appellee the District of Columbia.

*Margie M. Clark*, guardian ad litem, for appellee Z.W.

Before GLICKMAN and EASTERLY, *Associate Judges*, and FERREN, *Senior Judge*.

Opinion of the court by *Senior Judge* FERREN.

Concurring opinion by *Senior Judge* FERREN, with whom *Associate Judge* GLICKMAN joins, at page 59.

Concurring opinion by *Associate Judge* EASTERLY at page 66.

FERREN, *Senior Judge*:  Appellant M.W., the biological father of minor child Z.W., appeals the trial court's change of Z.W.'s permanency goal from reunification with appellant to adoption.[1]  Because we find no abuse of discretion in the trial court's ruling that a preponderance of the evidence supports the goal change, we affirm.

## I. Factual and Procedural Background

### A. Removal from the Home

Z.W. was born on February 5, 2015, and is the biological son of mother M.G. and father M.W.  On October 7, 2016, the District of Columbia Child and Family Services Agency ("CFSA" or the "agency") received a call on its child abuse and neglect hotline from the Metropolitan Police Department, as the police had found Z.W., who was 20 months old at the time, alone at M.G.'s home.  M.G. was charged with second-degree child cruelty, and was issued a stay-away order

---

[1]  M.G., the biological mother of Z.W., neither sought review of the magistrate judge's decision nor appealed the associate judge's decision.  She did, however, file a statement in lieu of brief indicating that she supports M.W.'s position that the permanency goal change to adoption was contrary to Z.W.'s best interests.  M.G. is mentioned in our recitation of the facts to the extent that her involvement is relevant, but because she did not appeal to this court, we do not consider her in our discussion of the issues in this case.

prohibiting her from having contact with Z.W. CFSA placed Z.W. in M.W.'s care, informed him of the stay-away order, and developed a safety plan with M.W. for Z.W.'s care. On October 25, 2016, agency staff again discovered Z.W. alone in M.G.'s home, where M.W. had left him. CFSA removed Z.W. from the home that day, placed him in shelter care, and filed a petition to open a neglect matter in Superior Court.

## B. The Neglect Matter

The case came before Magistrate Judge Julie Breslow, who held an initial hearing in October 2016, followed by a disposition hearing in January 2017, at which she accepted M.W.'s stipulation that Z.W. was a neglected child. Two quarterly disposition review hearings followed in May 2017 and September 2017, and, finally, a permanency hearing occurred in December 2017.[2] During this nearly fourteen-month period, there were three CFSA social workers on the case: Michaela Henderson (from October 2016 to August 2017), Edgina Sherman (from

---

[2] Generally, the court holds a disposition hearing after a finding of fact has been made in a neglect case, *see* D.C. Code § 16-2301(17), -2317, -2323 (2012 Repl.); D.C. Super. Ct. Neg. R. 25, and holds hearings to review the disposition at least every six months thereafter, unless a permanency hearing has been held within the past six months. *See* D.C. Code § 16-2323(a)-(b); D.C. Super Ct. Neg. R. 28, 30.

August to October 2017), and Molly Byrom (from November to December 2017), all of whom were responsible for working with the family to ensure the health, safety, and well-being of the child and the parents. Meanwhile, Z.W. had been placed initially in a traditional foster home (with a non-relative). In June 2017, he was moved to the home of B.W., who is M.W.'s sister, where he stayed until November 2017, when B.W. indicated that she could no longer care for Z.W. and arranged for relatives, the M.'s, to foster him.

Because there is some dispute regarding what steps the court ordered M.W. to take during this period, as well as when it ordered him to take these steps and how much time it gave him to comply, the specifics of each court order are laid out below.

    1. <u>October 28, 2016 Initial Hearing</u>

At the initial hearing on October 28, 2016, both M.W. and his counsel were present, and Magistrate Judge Breslow made findings that it was contrary to Z.W.'s welfare to be in M.W.'s care because M.W. had left the child with M.G., despite knowing of M.G.'s stay-away order, criminal charge, and substance abuse.

The court's order established the following requirements for M.W. in the sections pertaining to "visitation" and "services":

- Visitation between M.W. and Z.W.
    - Visitation supervised by CFSA or its designee
- Services
    - Parenting Skills
    - Domestic Violence ("DV") Assessment[3]

2. January 13, 2017 Disposition Hearing

At the disposition hearing on January 13, 2017, M.W. and his counsel again were present. In the order issued at the disposition hearing, the court took notice of a neglect stipulation that M.W. had signed on December 16, 2016, stating that the stipulation provided facts sufficient for the court to adjudicate Z.W. neglected. The stipulation noted M.G.'s criminal case and the stay-away order; acknowledged the incident in which M.W. left Z.W. with M.G.; and agreed that Z.W. was a

---

[3] As Magistrate Judge Breslow later explained in her permanency goal change order, issued in December 2017, social worker Henderson had concerns regarding domestic violence between M.W. and M.G. She had observed M.W. behave "in an angry and controlling way toward [M.G.]," "snapping" at her and "cutting her off." The DV classes, therefore, were intended to ensure that M.W. would not expose Z.W. to DV in the home. Similarly, in her May 2017 hearing order, which was admitted in evidence at the permanency hearing in December 2017, the magistrate judge included a notation that M.W. and M.G. "have [a] volatile relationship" and must visit with Z.W. separately.

neglected child under D.C. Code § 16-2301(9)(A)(ii), due to having been left "without proper parental care or control."

The disposition hearing order contains a notation indicating that the court took notice of a predisposition report from CFSA and of a case plan prepared by CFSA. While the predisposition report is included in the record on appeal, a written case plan is not. It is unclear why the plan is missing, but a later exchange between the court and the attorneys at the May 16, 2017 disposition review hearing confirmed that CFSA social worker Michaela Henderson had prepared a written case plan, which did not appear in the court's official file because of a glitch in the court's filing system. However, both the magistrate judge and M.G.'s counsel acknowledged having a copy of the case plan stamped by the Magistrate Judges' Chambers. M.W.'s counsel said that she also thought she had the document, and Z.W.'s guardian ad litem said that she had a copy stamped by the Counsel for Child Abuse and Neglect Office within the Family Court.

The January 2017 disposition hearing order set out, at the top of the first page, the dates for the upcoming disposition review hearings (May 16, 2017 and September 15, 2017), as well as the date for the permanency hearing (December 4, 2017). The order also included the magistrate judge's findings, based upon the

stipulation of neglect, that it was still contrary to Z.W.'s welfare to be in M.W.'s care. She also made findings that CFSA had made reasonable efforts to return Z.W. safely to his biological family's home, stating that the agency had facilitated visitation and that the social worker was making efforts to improve agency communication with the parents. M.W. objected to this communication finding, but the basis for his objection is not explained. The magistrate judge then made a notation in the "reasonable efforts" section of the order that the social worker had referred M.W. to "parenting, the Father Hood [sic] Initiative and the Man 2 Man intervention group,"[4] and that the social worker had begun the DV assessment process. Finally, the magistrate judge set the permanency goal for Z.W. as "reunification" with a biological parent. Her order set out the following requirements for M.W. in its sections pertaining to "visitation," "orders," and "services":

- Visitation between M.W. and Z.W.
  - Visitation supervised by CFSA or its designee

_____
    [4] The Fatherhood Initiative was not explained or elaborated upon in that order, nor was it mentioned in subsequent disposition review hearing orders. It was mentioned only in passing at the December 2017 permanency hearing, and was not discussed in the trial court's decisions changing the goal. We therefore need not consider it. In contrast, the Man 2 Man DV program featured significantly in the neglect matter and is discussed at length below. See *infra* sections III.A-C.

- Orders[5]
  - Cooperate with CFSA to ensure Z.W. receives audiology screening and Strong Start referral (M.W. objected to this order)
  - No physical discipline
- Services
  - Drug Testing[6]
    - Same-day spot-test
      - If negative, future testing suspended
      - If positive, weekly thereafter
  - DV Assessment

---

[5] The orders section also included this text: "In Re: T.A.L. NOTICE TO PARENTS. Parents [M.G.] and [M.W.] are hereby NOTIFIED that if they do not substantially comply with orders and services in this case, the goal of the case may be changed to ADOPTION." This was followed by a brief explanation of the evidentiary hearing on the permanency goal that would be held pursuant to our *Ta.L* decision, see *infra* note 7 and section II, including the parents' rights to present evidence and arguments at that hearing. It stated that the date of the permanency hearing would be December 4, 2017, and that, if the government or any other party intended to seek a permanency goal change to adoption, it must provide notice by September 1, 2017.

[6] As discussed in sections III.A-C, *infra*, based on concerns expressed by social worker Henderson at the January 2017 disposition hearing that M.W. may have been using drugs, the court ordered drug testing for M.W. at that hearing, as well as at the May 2017 and September 2017 disposition review hearings. At the December 2017 permanency hearing, social worker Henderson testified that she initially had recommended drug testing for M.W. based on statements from M.G. and M.G.'s sister that M.W. used drugs. It also appears from M.W.'s drug testing record with the Pre-Trial Services Agency, which was admitted in evidence at the permanency hearing, that M.W. had submitted to at least three drug tests in November and December of 2016 (prior to the January 2017 disposition hearing) that were positive for cocaine. It is unclear why M.W. engaged in drug testing prior to the January 2017 order, and it is also unclear whether Henderson, other agency staff, or Magistrate Judge Breslow were aware of these earlier drug tests, although there is no indication in the record that they were.

3. <u>May 16, 2017 Disposition Review Hearing</u>

At the May 16, 2017 disposition review hearing, M.W. was not present (for reasons that do not appear in the record), but his counsel was. The order from the hearing indicates that the agency filed a disposition report with the court in advance of the hearing, but did not file a case plan. It is unclear why a case plan was not filed, but, as noted earlier, there was an exchange at this hearing which indicated that the social worker had prepared a written plan and submitted it to the court, but that, due to a technical glitch, that case plan did not appear in the court file. The hearing order also indicated, at the top of the first page, that the next disposition review hearing was scheduled for September 15, 2017, and that a permanency hearing was scheduled for December 4, 2017.

In her order, the magistrate judge made findings that the agency had thus far made "reasonable efforts" to reunify Z.W. with M.W., based on the agency's monitoring and interventions to support Z.W.'s safety, placement, and well-being, (including his medical and developmental needs and services). She noted the agency's offering of supervised visits to the parents; its efforts to help M.W.'s sister obtain emergency licensure as a foster parent; and its efforts to assess and refer M.W. to various services and programs. M.W. objected to these reasonable

efforts findings. His counsel argued that she did not know to which anger management class M.W. had been referred, and that there had been a delay in CFSA's referral of M.W. to a parenting class. M.W., however, was already attending the parenting class at that point (and, as discussed below, see *infra* section III.C, that class included an anger management component that satisfied the court's order).

The magistrate judge also made findings that M.W. had made "progress" toward the permanency goal of reunification, based on his attendance at a parenting class and his completion of a DV assessment, but she noted that M.W. must complete any service recommended as a result of the DV assessment, as well as the parenting class and an anger management program.

The court's order set out the following requirements for M.W.:

- Visitation between M.W. and Z.W.
  - Visitation supervised by CFSA or its designee
  - Visitation must be separate from mother and not at her home
- Orders
  - Anger management course
  - Any service recommended by the DV assessment, including Man 2 Man or other approved program
  - Spot testing for drugs (available at the courthouse) and continued testing until six consecutive negative tests provided
  - Regular visitation

- - o Engagement with speech therapist and participation in Z.W.'s speech therapy
  - Services
    - o Drug Testing
      - Test prior to May 19, 2017
      - Weekly testing thereafter until six consecutive tests provided

4. <u>September 15, 2017 Disposition Review Hearing</u>

M.W. and his counsel were present at the September 15, 2017 hearing. Like the disposition hearing review order from the May 2017 hearing, the order from the September 2017 hearing indicates that an agency disposition report was filed, but a case plan was not. The order also noted that "CFSA filed a written notice of a request to change the permanency goal to ADOPTION and an evidentiary permanency hearing has been scheduled." And, like the orders from the two prior quarterly hearings, the September 2017 order noted, at the top of the first page, that that permanency hearing was scheduled for December 4, 2017.

The magistrate judge's order included findings that the agency had engaged in "reasonable efforts," through its social workers, toward reunification based on their visits with Z.W. to monitor his well-being and his transition to B.W.'s foster-care home; their efforts to attend to Z.W.'s medical and developmental needs, including speech and language therapy; their enrollment of Z.W. in day care; and

their efforts to assess and refer M.W. to other services and programs. M.W. objected to the reasonable efforts findings, although the basis for his objection was not explained.

The magistrate judge also made findings that M.W. himself had not made "progress" toward reunification, based on his failure to complete the recommended DV program (Man 2 Man), visit Z.W. consistently, or drug test as ordered. M.W. likewise objected to these findings, asserting that that he had a job and housing, had completed a parenting course, was visiting Z.W. regularly, and was not ordered to complete the Man 2 Man DV course until that day. Yet, M.W. had indeed been ordered to complete Man 2 Man prior to that day. At the January 2017 hearing, the magistrate judge had ordered M.W. to undergo a DV assessment and specifically mentioned the agency's referral of M.W. to Man 2 Man. And, at the May 2017 hearing, the magistrate judge had ordered M.W. to follow the recommendations of the DV assessment, explicitly referring to Man 2 Man. In fact, M.W.'s counsel represented at the May 2017 hearing that M.W. had begun attending the Man 2 Man course and enjoyed it.

In sum, in the September 2017 hearing order, the magistrate judge required:

- Visitation

- o Visitation supervised by CFSA or its designee
- o Visitation must be separate from mother and not at her home
- Orders
  - o Drug testing (weekly)
  - o APRA [Addiction Prevention and Recovery Administration] assessment and any recommended drug treatment
  - o Completion of Man 2 Man program
  - o Consistent visitation
  - o Participation in Z.W.'s speech therapy
- Services
  - o DV counseling: Man 2 Man
  - o Drug testing
    - Spot test on September 20, 2017
    - Weekly testing thereafter
  - o APRA assessment and compliance with recommendations

## C. The Permanency Goal Change

### 1. December 4, 2017 Permanency Hearing

On August 31, 2017, before the September disposition review hearing, the government had filed a notice of its intent to seek a change in Z.W.'s permanency goal from reunification to adoption. Three months later, on December 4, 2017, Magistrate Judge Breslow held a permanency hearing to determine whether a goal change was appropriate, pursuant to *Ta.L.*[7]

---

[7] *In re Ta.L.*, 149 A.3d 1060 (D.C. 2016) (en banc). See *infra* section II.

At the hearing, the magistrate judge took judicial notice of several documents in the record, including the hearing orders that she had issued at the quarterly hearings, the parents' stipulations of neglect, M.W.'s drug test results, and the parties' pretrial stipulation of facts. She then heard testimony for the government from the three CFSA social workers who had been on the case: Henderson, Sherman, and Byrom.

The social workers testified that they had engaged in frequent, ongoing efforts to meet and communicate with M.W., including efforts to engage him in creating and cooperating on the plan for reunification with Z.W. They stressed the importance of his visits with Z.W. and his participation in Z.W.'s speech therapy, and they informed and reminded M.W. of the services he was required to engage in as part of his efforts toward reunification. The social workers further testified that, despite their efforts, M.W. was often inconsistent and unreliable in his contact with the agency, would fail to attend meetings, did not complete all of the services he was ordered to complete (most notably, drug treatment and the DV course), was inconsistent in his visitation with Z.W., and was unengaged in Z.W.'s speech therapy.

Meanwhile, M.W. had arrived one hour and forty minutes late to the permanency hearing, appearing disheveled. He testified on his own behalf, but his speech was slurred, he was difficult to understand, and he admitted using drugs; he also tested positive for cocaine and marijuana that day.

In her closing argument at the hearing, M.W.'s counsel asserted that the agency had not proffered a formal case plan signed by M.W., and that no formal case planning meetings had occurred since February 2017. Counsel also argued that the agency had failed to make the required "reasonable efforts," relying on the case planning issues she had cited and additionally asserting that the agency did not maintain sufficient contact with M.W., did not refer him to a DV program other than Man 2 Man, and did not sufficiently demonstrate that his substance abuse impacted his ability to parent Z.W. Finally, counsel argued that, for his part, M.W. had made "adequate progress" toward reunification because he had completed certain plan requirements and had maintained employment and housing. She further asserted that, under this court's case law, "adequate progress" means "minimal progress."

2. The Magistrate Judge's Order

On December 13, 2017, Magistrate Judge Breslow issued findings of fact and conclusions of law. She made explicit credibility determinations, fully crediting the testimony of the three social workers: she found Henderson to be "a candid and credible witness," as well as "a very informative witness"; she found Sherman to be "a credible and informative witness," whose "testimony was especially credible because of how consistent it was with [] Henderson's testimony"; and she "fully credit[ed] [] Byrom's testimony." In contrast, the magistrate judge accorded "little weight" to M.W.'s testimony, particularly given his "impairment" during the hearing, although she took account of his admission that he had a substance abuse problem that "adversely impact[ed]" his ability to safely care for Z.W. She then considered the four *Ta.L.* criteria by which a goal change to adoption must be judged: (1) whether the government had provided a "reasonable plan" to reunify the family; (2) whether the government had made "reasonable efforts" in support of reunification; (3) whether the parents had made "adequate progress" toward the goals of the plan; and (4) whether the government had "adequately explored" alternatives to the termination of parental rights ("TPR"), including kinship placements.[8]

---

[8] *See In re Ta.L.,* 149 A.3d at 1078-79.

1. With respect to the agency's responsibility to devise a reasonable plan for achieving reunification, Magistrate Judge Breslow made detailed findings that the agency social workers had engaged in extensive efforts to work with the parents to create a plan, but that the parents did not meaningfully engage.[9] She summarized:

_____

[9] For instance, Magistrate Judge Breslow found that "Henderson tried diligently to get both parents to sit down with her and engage in case planning in order to achieve the goal of reunification," that Henderson "spoke to each of them frequently by telephone and at court hearings, and exchanged many text messages with both of them," and that Henderson "made frequent phone calls and sent many text messages to the parents in order to try to engage them in case planning, to figure out what services they needed." And yet, "despite [] Henderson's efforts to get [M.W.] to meet with her and discuss plans for [Z.W.], including [Z.W.'s] well-being and services that could be provided to [M.W.], [M.W.] never sat down with [] Henderson to engage in case planning." The magistrate judge "fully credit[ed] [Henderson's] testimony and [found] that [] Henderson tried very hard to engage both parents . . . and to get them to take part in the planning process necessary to make a plan for reunifying them with their son," but that "[h]er efforts were not successful due to the parents' failure to meet with [her] to make plans for [Z.W.]'s case." Similarly, the magistrate judge found that "Sherman placed many phone calls and sent many text message to [M.W.,] and in each communication she asked him to meet with her to discuss case planning for [Z.W.]." The magistrate judge "fully credit[ed] [Sherman's] testimony that she made extensive efforts to work with the parents and engage them in planning for [Z.W.]'s case," and that she "tried repeatedly to get each parent to engage in case planning," but that, "[d]espite her many phone calls and text messages to the parents, the parents did not engage with her and she was unable to do any meaningful case planning with them." Finally, said the judge, Byrom made "her own efforts to engage [the parents] in case planning," and "encouraged each parent to sit down with her for case planning outside of visitation times, but neither did." "Just like the two prior social workers assigned to this case before her, she made extensive efforts to engage the parents in case planning, but neither parent cooperated," so "[s]he was unsuccessful in sitting down with either parent to develop a case plan."

> [T]hree CFSA social workers have made significant efforts to schedule case planning meetings with the parents; all three were unsuccessful. Their testimony was remarkabl[y] similar and corroborated each other's testimony. Each social worker contacted the parents many times, by many different means, and all tried to get the parents to focus on case planning and making a plan for completing court-ordered services. All three social workers attempted to do this, and each time, each parent failed to engage in case planning with the social workers.

The magistrate judge noted that at least one social worker had admitted that she had failed to comprehensively document her communications with Z.W.'s parents, and the magistrate judge also appeared to acknowledge, at least implicitly, that the court's case file did not include a written, signed case plan prepared by the agency.[10] In spite of these circumstances, however, Magistrate Judge Breslow fully credited the testimony of the social workers regarding their efforts to engage the parents in case-planning, and found that "[t]here was no way for the social workers to develop a written case plan with parents who failed to meet with them." She further determined that "[t]aken collectively," the court's orders at the quarterly hearings, which incorporated CFSA recommendations in "set[ting] forth the specific services and actions that each parent needed to do" – and which were entered in evidence at the permanency hearing – "set forth a written plan of action

_____

[10] At the hearing, the magistrate judge had expressed that she was "not happy with the case planning that occurred in this case," which was "not the worst" but also "not the best [she had] ever seen."

for achieving reunification." Thus, she concluded, "by a preponderance of the evidence, that the government provided the parents with an appropriate and reasonable plan for achieving the goal of reunification."

2. The magistrate judge also made detailed findings that the CFSA social workers had made the required reasonable efforts to support the parents achieving reunification with Z.W.[11] In short:

> The testimony of the three social workers corroborated each other, and they each testified convincingly that they made repeated efforts to meet with and assist the parents with the services ordered by the court and required for reunification. Each social worker spoke with the parents by telephone and exchanged many text messages with the

_____

[11] For instance, she noted that "[e]ach phone call and text message from [] Henderson to the parents was an effort to encourage the parents to attend visits, to work with her on case planning for [Z.W.], to find out what type of assistance each parent needed, and to offer that assistance." The magistrate judge also noted that Henderson tried to "assist [the parents] in participating in court ordered services designed to promote reunification" and made "significant efforts to get the parents to meet with her, visit their child regularly, interact with [Z.W.]'s speech therapist and daycare provider, and get drug treatment." She also described Sherman's efforts: she "followed up on referrals," contacted service providers, and "spoke with [M.W.] by telephone and told him what he needed to do to return to Man 2 Man, and where and how to get the APRA assessment. She also reminded him to submit to his court-ordered drug tests." Referring to Henderson and Sherman, the magistrate judge found: "Both social workers tried diligently to engage the parents in court-ordered services designed to promote reunification, and neither had any real success." She also noted that "Byrom assessed the significant efforts of her predecessor social workers to engage the parents in case planning and in their son's education, as well as her own efforts to engage them in case planning."

parents, and each repeatedly told the parents about the importance of engaging in services, offered the parents help in accessing services, and tried, unsuccessfully, to schedule case planning meetings with the parents. Each social worker stressed to the parents the importance of visiting the child regularly.

She then concluded that "CFSA's efforts, through the actions of the three social workers, are more than sufficient for the [c]ourt to conclude, by a preponderance of the evidence, that CFSA expended reasonable efforts to reunify the family and help the parents achieve the goal of reunification."

3. As to M.W.'s progress toward meeting the requirements of the plan, the magistrate judge made findings, based on the social workers' testimony, that he had failed to make adequate progress.[12] She summarized these findings as follows:

_____

[12] The magistrate judge found, for instance, that "[b]oth parents' attendance at visitation [with Z.W.] was inconsistent and sporadic," and that M.W. "did not engage in drug testing or treatment, and didn't visit consistently." "Once [Z.W.] was placed with B.W., [his paternal aunt,] Henderson hoped that [M.W.'s] frequency of visitation would improve because he was permitted to visit [Z.W.] at B.W's home under B.W.'s supervision. However, he did not become more consistent with visitation." Magistrate Judge Breslow also cited Henderson's "fear[] that the parents were not making sufficient progress to actually achieve reunification," despite her efforts, and Henderson's assessment of the parents' "failure to engage in services, their failure to visit [Z.W.] consistently, and their failure to address the underlying conditions of neglect that led to the child's removal." Similarly, when Sherman rotated onto the case in August 2017, Sherman noted that, while M.W. had completed the DV assessment and a parenting class, he had not yet "drug test[ed], complete[d] an APRA assessment, []

(continued . . .)

"[M.W.] did complete parenting classes and a [DV] assessment but did not complete the Man 2 Man . . . . He did complete the APRA assessment . . . [and] started treatment at Harbor Lights," but "[h]e tested positive for cocaine and marijuana on the day of the evidentiary hearing and failed to visit [Z.W.] regularly." Magistrate Judge Breslow then found, "by a preponderance of the evidence, that [M.W.] failed to make adequate progress toward satisfying the requirements of the plan to achieve the goal of reunification."

4. Finally, the magistrate judge made factual findings that CFSA had attempted to obtain information from the parents regarding biological relatives who could serve as kinship placements for Z.W. and to pursue these placements,

_____

( . . . continued)
visit[ed] [Z.W.] consistently," or "completed the Man 2 Man program." As noted above, Sherman made efforts, but the magistrate judge found that, "[l]ike [] Henderson, [] Sherman had no success getting [M.W.] to do the things necessary for reunification." Similarly, Byrom noted "the parents' lack of progress toward reunification": she "credited [M.W.] for completing parenting class, the [DV] assessment, and the APRA assessment," but she "noted that [M.W.] failed to complete Man 2 Man, the service recommended in the [DV] assessment, had not provided proof of engagement in drug treatment services, had recently tested positive for cocaine and marijuana, and had not visited [Z.W.] consistently." These findings were consistent with the magistrate judge's comments at the permanency hearing, in which she noted that M.W. had made some efforts resulting in some progress, but characterized his situation as "too little, too late" – particularly given his continuing drug problem, including his impaired presentation at the hearing.

but that these efforts were ultimately unsuccessful.[13] She therefore concluded that a preponderance of the evidence established "that the District [] has adequately explored other vehicles for avoiding the pursuit of termination of parental rights by licensing kinship care providers for [Z.W.]."

Having concluded that all four *Ta.L.* criteria for a permanency goal change[14] had been satisfied, Magistrate Judge Breslow changed Z.W.'s permanency goal from reunification to adoption.

3. The Associate Judge's Order

---

[13] For instance, "Henderson asked each parent if there were any relatives or kin who would be willing to be caregivers for [Z.W.], and in June of 2017, at [M.W.'s] request, [Z.W.] was moved to [the] home of [M.W.'s] sister[, Z.W.'s] paternal aunt," although she ultimately failed to maintain her foster license and requested that Z.W. be moved to another home. At that point, Sherman "asked [the parents] for contact information for any other relatives or friends who might be willing to become a kinship care provider for [Z.W.] [The paternal aunt] identified a family friend who was a potential caregiver, and [M.W.] thought this person might be a suitable caretaker for [Z.W.]. [M.G.] gave [] Sherman several names of people she thought might be able to care for [Z.W.] Eventually, CFSA licensed Mr. and Mrs. M. (relatives of [M.W.]), and [Z.W.] was placed with the M.'s."

[14] *In re Ta.L.*, 149 A.3d at 1078-79.

M.W. sought review of the goal change decision, and, on January 19, 2018, Associate Judge Steven Wellner issued a detailed order addressing M.W.'s assignments of error and affirming the magistrate judge's ruling.

Judge Wellner *first* addressed M.W.'s contention that CFSA had failed to provide a reasonable reunification plan, as required by *Ta.L.*,[15] because the agency did not hold formal case-planning meetings after February 2017 or provide him with a written case plan. He noted the magistrate judge's findings that the social workers had attempted to engage in more formalized case-planning with M.W., but were unsuccessful due to M.W.'s lack of engagement. He then concluded "that the absence of a more formal case plan was mostly attributable to the parents' own failure to meet with the social workers." He also observed that M.W. "offers no support" for his assertion that *Ta.L.*'s requirement of a "reasonable plan for reunification" means entitlement to a "formal case plan" issued by CFSA. He concluded that *Ta.L.* "does not require that the plan presented to the parent be in

_____

[15] *Ta.L.*, 149 A.3d at 1078. While this case was opened before *Ta.L.* was decided in December 2016, we have held that *Ta.L.* applies retroactively. *In re Sa.C.*, 178 A.3d 460, 461-62 (D.C. 2018); *see also In re J.M.*, 193 A.3d 773, 780 (D.C. 2018); *In re K.C.*, 200 A.3d 1216, 1236 n.12 (D.C. 2019). However, the court has granted a petition for rehearing en banc in a case in which the government is challenging both the continued retroactive application of *Ta.L.* and seeking the right to immediate, interlocutory appeal of a decision that changes the permanency goal from adoption back to reunification. *In re S.M.*, No. 17-FS-1192 (D.C. 2017), *petition for reh'g en banc granted* (March 30, 2018).

any particular format, nor does it use the term 'case plan' to describe what is required to be established during the [] *Ta.L.* hearing." Finally, he found that the magistrate judge had reasonably determined that her own hearing orders constituted a plan, regarding which M.W. had undisputed notice. Thus, he concluded that the magistrate judge did not err in ruling that the agency had provided M.W. with a "reasonable plan" for reunification.

As to M.W.'s *second* contention – that "CFSA should have expended *more* effort to help him achieve reunification" – Judge Wellner noted that M.W. "does not challenge [the magistrate judge's] findings that the social workers made repeated efforts to meet with him and assist him with the services ordered by the trial court; that each social worker spoke with [him] by telephone, exchanged text messages with [him], and repeatedly reminded [him] of the importance of engaging in services; and offered [him] help in accessing services." The reviewing judge therefore concluded that the magistrate judge did not err in concluding, based on "ample undisputed evidence," that the government made extensive efforts towards reunification, and that, even if those efforts had been "imperfect," they were, in their totality, "reasonable."

With respect to M.W.'s *third* argument, regarding the adequacy of his progress, Judge Wellner began by observing that M.W. "does not dispute the [magistrate judge's] key findings of fact on this point" but instead "challenges the . . . legal conclusion that 'adequate progress' requires something more than the minimum amount of progress that a parent must achieve." In response to this argument, the judge found no support in statutory or case law that the "minimal progress" M.W. had made was sufficient to satisfy the "adequate progress" inquiry under *Ta.L.* He then went on to address M.W.'s contention that the magistrate judge's "conclusion was unreasonable under [her] own standard for progress." He found that the magistrate judge had "consider[ed]" and "weigh[ed] evidence relating to M.W.'s "history of substance abuse, his failure to complete the 'Man 2 Man' program, and his failure to visit [Z.W.] regularly," and that she therefore "did not err" in "conclud[ing] that [M.W.] had not made adequate progress toward reunification."

Addressing M.W.'s *fourth* and final assertion – that the agency did not sufficiently explore alternatives to TPR – Judge Wellner noted that M.W. did not question the magistrate judge's factual findings that the agency had explored kinship options based on the suggestions made by the parents, including M.W.'s own sister, with whom Z.W. had been placed for some months. The judge then

concluded that M.W.'s assertion that CFSA was required to explore guardianship options was not supported by law, because the D.C. Code "authorizes the court to issue a guardianship order only if the court first finds that adoption is not appropriate for the child,"[16] and that, in this case, the magistrate judge had ruled, convincingly, that adoption was appropriate.

Finding no abuse of discretion, the reviewing judge issued a final order affirming the magistrate judge's order in its entirety. M.W. then filed this appeal.

## II. Legal Framework and Standard of Review

The D.C. Code mandates that, in neglect matters, the trial court hold a permanency hearing within twelve months of the child's entry into foster care, the purpose of which is to determine whether the child should be returned to his or her biological parent(s), placed for adoption, placed in guardianship, or placed in another permanent living arrangement.[17] As this court recently noted, our en banc decision in *Ta.L.* specified four criteria for evaluating the government's

---

[16] *See* D.C. Code § 16-2383(c)(2) (2012 Repl.).

[17] D.C. Code § 16-2323(a),(c); *see also* 42 U.S.C.A. § 675(5)(C) (West 2018); 42 U.S.C.A. § 675a (West 2014).

recommendation of a permanency goal change:

> [I]n a neglect case, a trial court's change of a child's permanency goal from reunification to adoption is immediately appealable to this court, and we will review for abuse of discretion, upholding the trial court's decision if it held a full hearing and found, by a preponderance of the evidence, that:
>
> (1) the government provided the parents with a *reasonable plan* for achieving reunification;
>
> (2) the government made *reasonable efforts* to help the parents ameliorate the conditions of neglect and to reunify the family;
>
> (3) the parents failed to make *adequate progress* toward the goals of the plan; and
>
> (4) *other options* for avoiding the termination of parental rights, including kinship placements, have been *adequately explored*.[18]

*Ta.L.* also clarified that "due process requires a more formal hearing"[19] because a goal change "is a critical point in the proceedings . . . that often irreversibly dictates" the ultimate outcome of the case.[20]  Still, the trial court enjoys "broad discretion" in making permanency goal decisions, and the scope of our

---

[18]  *In re K.C.*, 200 A.3d at 1235 (emphasis added) (discussing *In re Ta.L.*, 149 A.3d at 1078-79).

[19]  *In re Ta.L.*, 149 A.3d at 1078.

[20]  *Id.* at 1076.

review is limited.[21] The standard of review is abuse of discretion, and we will affirm if the trial court "exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor."[22] A trial court's determination must "be based upon and drawn from a firm factual foundation. . . . It is an abuse of discretion if the stated reasons do not rest upon a sufficient factual predicate," if "it rests its conclusions on incorrect legal standards," or if "it makes an error of law."[23] Overall, "[t]he appellate court role in reviewing the exercise of discretion is supervisory in nature and deferential in attitude."[24] Finally, in conducting our review of the trial court's decision, we look to both the final order of the associate judge and the underlying order of the magistrate judge.[25]

### III. Analysis

On appeal, M.W. argues that the trial court erred in its decision to change

---

[21] *Id.* at 1081.

[22] *Id.* at 1079 (citation omitted).

[23] *In re Ko.W.*, 774 A.2d 296, 303 (D.C. 2001) (citations, brackets, and internal quotations marks omitted).

[24] *In re D.B.*, 947 A.2d 443, 446 (D.C. 2008) (citation omitted).

[25] *In re K.C.*, 200 A.3d at 1232 n.8; *see also In re S.L.G.*, 110 A.3d 1275, 1285 (D.C. 2015).

Z.W.'s permanency goal because the government did not meet its burden of demonstrating that the four permanency goal change factors weighed in favor of changing the goal from reunification to adoption.

We begin by noting that, while the evidence in this case may not be as overwhelming as it is in some cases, it is clear that Magistrate Judge Breslow held a formal hearing on the potential goal change, at which the parents were given the opportunity to testify and present evidence. After the hearing, the magistrate judge issued a detailed written opinion, in which she made extensive findings of fact, including explicit credibility determinations regarding the witnesses who testified at the hearing – determinations that we do not second-guess on appeal. Indeed, "in non-jury trials, it is within the province of trial judges to observe the demeanor of witnesses and to make credibility determinations, which inform the judges' decisions."[26] We "will not redetermine the credibility of witnesses where . . . the trial court had the opportunity to observe their demeanor and form a conclusion."[27] Magistrate Judge Breslow then drew conclusions of law based on these factual findings, offering reasoned explanations for her determination, by a preponderance

_____

[26] *In re A.B.*, 955 A.2d 161, 167 (D.C. 2008).

[27] *In re N.D.*, 909 A.2d 165, 171 (D.C. 2006) (quoting *In re E.H.*, 718 A.2d 162, 169 (D.C. 1998)).

of the evidence, that the *Ta.L.* factors supported a goal change to adoption.

Finally, Associate Judge Wellner conducted a thoughtful, thorough review of the magistrate judge's decision in light of each of M.W.'s claims of error, ultimately finding no abuse of discretion and affirming the decision. It is against this backdrop that we now conduct our review.

**A. Reasonable Plan for Reunification**

M.W. argues that the agency did not provide him with a "reasonable plan" for achieving reunification because (1) the agency failed to proffer formal case plans signed by M.W. and held only three formal case planning meetings, none of which took place after February 2017; (2) M.W. did not have adequate notice of the plan requirements or the fact that reunification was dependent upon his fulfilment of these requirements, particularly drug testing and treatment; and (3) the plan (such as it was) did not adequately evolve over time to meet M.W.'s needs, even when he expressed dissatisfaction with certain aspects of it, including the requirement that he attend a DV program called Man 2 Man. We are not persuaded.

## 1. Formality of Case Plans

As to the formality of case plans, we reiterate that there is no written case plan included in the record on appeal.[28] Even so, we conclude that, under the circumstances, this omission does not strengthen M.W.'s argument for two reasons: his own serious default in failing to participate in development of the required plan, and his failure to show that he suffered any prejudice from lack of a written, filed case plan. [29]

_____

[28] As mentioned earlier, however, it appears that the agency did, in fact, prepare a written case plan that, because of technical difficulties, did not become a part of the court's official file. See *supra* sections I.B.2., I.B.3. We do not understand why the agency was able to properly file its predisposition report and disposition reports, but not its case plan. Nor do we understand why the magistrate judge did not require the government to resolve the technical issue and successfully file the written plan.

[29] We pause here to note that, as a general matter, once a child is removed from the home for parental neglect, the agency is required to ensure that a plan for reunification is spelled out in writing. *See, e.g.*, D.C. Code §§ 4-1301.02(3), 4-1301.09(d)-(e), 16-2323(b)(3), 16-2354(g) (2012 Repl. & 2019 Repl.); Super Ct. Neg. R. 15(b)(6), 19(f)(2), 29(b)(7), 33(j), 34(g)(12), 35(c)(2); 42 U.S.C.A. §§ 671(a)(16), 675(5) (West 2019); 45 C.F.R. § 1356.21(g) (2019). Every reasonable effort should be made to collaborate with the parent(s) in preparing the case plan and to have the plan signed by the parent(s), filed with the court, and eventually admitted in evidence so that there can be no question about what is required and acknowledged. *See In re A.I.*, 211 A.3d 1116 (D.C. 2019) (reviewing the legal framework applicable to permanency goal changes, particularly with reference to a reasonable plan for reunification). Even when the parents refuse to cooperate on case-planning or to sign the case plan document, the agency can and should file a written case plan with the court. *Id.* at 1124-26, 1128-30.

(continued . . . )

As to the first, the magistrate judge credited the social workers' testimony, discussed above, that they had conducted extensive outreach to M.W. to elicit his help in developing a case plan. Specifically, the social workers had attempted to schedule meetings with M.W. to discuss the plan, but M.W. had been uncooperative and failed to maintain contact and engage with the social workers. Thus, even if we assume that the lack of case-planning meetings after February 2017 was problematic, the evidence supports a finding that it was attributable to M.W.'s own unresponsiveness.[30]

_____

( . . . continued)

The plan can then evolve through written updates as circumstances warrant, reflecting court orders based on agency notes, reports, and information provided at disposition and disposition review hearings. These updated documents, filed with the court before the hearings, will help clarify and expedite each proceeding. This fully written record may not entirely protect the situation against slippage of expectations; misunderstandings may arise along the way. But it will no doubt contribute to essential clarity for all concerned.

Finally, in fairness to the trial court, it is important to note that this court's decision in *In re A.I*, ruling that District law requires a written case plan, was issued on August 1, 2019, more than eighteen months after the trial court order by the reviewing judge sustaining the permanency goal change on January 19, 2018, (and over six months after argument of this appeal). Accordingly, although we accept *A.I.*'s case plan ruling, we do not fault the trial court for concluding that CFSA had developed a reasonable plan for reunification, consistent with *Ta.L.*, as evidenced by social worker testimony and evaluated and applied in the magistrate judge's orders at the disposition review and permanency hearings.

[30] *See In re A.I.*, 211 A.3d at 1129 (rejecting parent's "argument that she never participated in [case] planning," as it was the parent who rebuffed the agency's repeated attempts to engage her in case-planning, and a parent "cannot

(continued . . . )

Second, we discern no prejudice to M.W. from the government's failure to file a formal, written case plan in the record. On appeal, M.W. has made only a brief, bare assertion that the plan for reunification was lacking in formality, and, other than his argument that he lacked notice of the plan requirements – which we reject as meritless below – he has failed even to allege, let alone demonstrate, that he suffered any prejudice as a result of putative deficiencies in the formality of the case plan.

To the contrary, it is clear that the steps the agency took to assist M.W. in reunification planning reflect the very elements it would have included in a written, formally filed case plan created without M.W.'s involvement. Because M.W. refused to cooperate, a formal written plan created by the agency – based on what the agency knew of M.W.'s situation – would have involved (1) setting expectations for what M.W. must accomplish to achieve reunification, (2) referring M.W. to programs and services, and (3) outlining the efforts the agency would

_____

( . . . continued)

defeat a permanency goal change by refusing to work with CFSA"); *In re K.C.*, 200 A.3d at 1237 (concluding that, because parent "refused to participate in the case-planning process and hampered the [a]gency's efforts to work with her on the plan," "[s]he cannot now argue, well after the fact, that the [a]gency should have done even more than it already did to overcome her uncooperativeness").

undertake to help him achieve that goal. The agency's actions fulfilled each of these elements. And, as elaborated below, all agency findings and recommendations were communicated to the court and included in the court's explicit directives to M.W. Thus, given his failure to cooperate, M.W. received everything from CFSA's reunification planning that he reasonably could have expected to receive – i.e., justifiable services responsive to his known needs – whether specified in a written and filed case plan or, as here, left to agency recommendation adopted in trial court orders. If M.W. required assistance beyond the support and intervention that CFSA was providing, he had an obligation to make the agency aware of those needs by participating in case planning. His failure to do so inevitably meant that any written case plan the agency filed with the court in support of reunification would not have been more suitable or robust than the plan the agency, in fact, followed to meet M.W.'s and Z.W.'s needs.

M.W. offers no substantive ground on which to challenge the lack of a formal, written case plan.[31] As discussed further below, he has not successfully

---

[31] The technical, rather than substantive, nature of M.W.'s objection to the lack of a formal, written case plan is underscored by the fact that, when M.W.'s counsel raised this objection – for the first time – during closing arguments at the permanency hearing in December 2017, she stated that "[t]he agency has proffered [] no formal case plans[,] signed by the parent or otherwise[,] into evidence for this proceeding[,] nor have any case plans b[een] filed in the court jacket." This

(continued . . . )

identified any particular respect in which CFSA's efforts (including its attempts to overcome his lack of cooperation) were deficient, or pointed to any legitimate reason that the trial court's rulings on the adequacy of reunification planning should be disturbed.[32]

2. Notice of the Plan Requirements

---

( . . . continued)

assertion, which is repeated almost verbatim in M.W.'s brief on appeal, appears to be a reference to the fact that CFSA created a written case plan, but failed to properly file it with the court. See *supra* note 28.

On a related note, even if M.W. did not sign a case plan, see *supra* note 29, this court has explicitly held that the lack of a parent's signature will not invalidate a case plan – particularly where, as here, the trial court concluded that any deficiency in the formality of the plan was due to M.W.'s own shortcomings in communication and engagement. *In re J.M.*, 193 A.3d at 781-82 (where the agency had filed a written plan, but the parent did not sign it, this lapse "did not render the case plan . . . unreasonable or inadequate," both because the document "was prepared at a time when the [parent] was not in contact with the agency, which was therefore unable to obtain her signature," and because "the case plan mirrored what the magistrate judge had ordered."); *see* also *In re A.I.*, 211 A.3d at 1129 (the plan for reunification was reasonable, even though the parent did not sign it, because the parent's "refusal to participate [in case-planning] does not render the case plan defective").

[32] Indeed, it would be irrational and unjust – particularly for a young child who is awaiting permanency – to reverse or remand in a case such as this one, where the parent knew what was required of him, failed to fully comply, and is now attempting to challenge the permanency goal change on a technicality that he has raised only cursorily before this court. This is especially so when, as also elaborated below, all factors weigh in favor of the goal change.

With respect to M.W.'s notice of the plan requirements, as explained below, the social workers devised, and clearly and repeatedly communicated, the plan requirements to M.W., and the court's hearing orders reiterated and reinforced these requirements for M.W., meaning he undoubtedly had the essential notice of them.[33]

As we have observed, the magistrate judge found that the social workers reached out to M.W. extensively to engage in case-planning, apprise him of the services and referrals required by court order, and remind him about his obligations to utilize these services over time. The reviewing judge affirmed these findings, stating that, "[t]o the extent there is any dispute about the social workers' follow-up on services or communications, the trial court's findings that they *did* follow up and make efforts to communicate regularly with [M.W.] are supported by substantial evidence in the record."

Moreover, M.W. and his counsel participated in the disposition and disposition review hearings and received the orders from those hearings, meaning

---

[33] *See In re J.M.*, 193 A.3d at 781-82 (finding that "the case plan mirrored what the magistrate judge had ordered"); *In re K.C.*, 200 A.3d at 1236 (noting associate judge's statement that "there is no [reason] . . . that the court's orders cannot satisfy the requirements of . . . communicating a plan to the parent").

that M.W. undoubtedly had notice of the plan requirements. The magistrate judge herself underscored, with respect to the hearings that were held prior to the permanency hearing, that M.W. had "attended three of the four hearings and his attorney [had] attended all four," thereby demonstrating that "the parents were well aware of what the plan for reunification required of them" was. The reviewing judge likewise explained that M.W. "was a regular participant in the hearings conducted in this case," where "the steps necessary for reunification were thoroughly discussed," and M.W. "does not dispute his receipt of this information."[34] The reviewing judge then cited the magistrate judge's orders from those hearings, which outline the plan requirements and were admitted in evidence at the permanency hearing. The orders explicitly stated that compliance with the court's instructions was required "to achieve reunification." M.W.'s participation in several of the court-ordered services – a fact that he himself highlights on appeal – further undermines any claim that he was unaware of the plan or its elements.

With respect to notice of drug testing and treatment requirements in particular, the magistrate judge ordered drug testing at the first disposition hearing on January 13, 2017, which both M.W. and his counsel attended. For unexplained

_____

[34] In fact, at the December 2017 permanency hearing, during his testimony, M.W. said to the magistrate judge: "I already know any time you say anything, it'd be a[n] order."

reasons, however, M.W. did not begin drug testing pursuant to court order until May 19, 2017 – three days after the court again ordered him to drug test at the disposition review hearing on May 16, 2017. Once drug testing confirmed drug use, the court ordered, at the next disposition review hearing on September 15, 2017, that M.W. complete an APRA assessment and engage in drug treatment if recommended by the APRA assessment. If M.W. had complied with testing in a timely fashion, he would have known much earlier that assessment and treatment would be required. Hence, the fact that he did not have notice of the need for drug treatment sooner appears to be a consequence of his own actions.[35] On the whole, then, the record belies any serious argument that M.W. was unaware of the plan or its features.

_____

[35] On a related note, although the September 2017 order requiring drug assessment and testing followed the government's August 31 notice that it would seek a permanency goal change, it appears that the court's order was issued in September because that was the date on which the next quarterly disposition review hearing was scheduled, and it was the first hearing to occur after M.W.'s first positive drug test results had been received. There is no indication that the court's order was in any way connected to the government's notice that it would seek a goal change, as M.W. suggests. Rather, the court's order that M.W. complete a drug assessment was a result of the information that the court had received following M.W.'s belated compliance with the prior drug testing orders. Moreover, the government's notice that it would seek a goal change was presumably issued on August 31 because, as discussed, the court's January 2017 order required the government to file any such notice by September 1, 2017. See *supra* note 5.

3.  Evolution of the Plan

M.W. also challenges the adequacy of the plan's evolution over time.  At the first (January 2017) disposition hearing, the magistrate judge learned from social worker Henderson that M.W. may have had a drug problem.  She therefore ordered drug testing – spot testing in the courthouse the very day of the hearing – and, if positive, weekly drug testing thereafter.  M.W., however, did not submit to that spot test or any other before the next hearing in May.  Therefore, at the May 2017 hearing, the court again ordered drug testing and specified that M.W. was required to submit six consecutive negative tests.  When M.W. finally began testing, he only submitted four tests before the next hearing in September – two in May and two in June – all of which were positive for cocaine and marijuana.  At the September 2017 hearing, as a result of M.W.'s positive tests and his failure to test regularly, the court ordered M.W. to be assessed for substance abuse and to follow any treatment recommendation resulting from the assessment.  Based on these facts, the magistrate judge's actions to modify the plan over time to address M.W.'s drug issues appear to be responsive and rational.

M.W. offers no logical reason why the plan should have evolved in a different direction – for example, away from the unsatisfied requirement that he

complete the Man 2 Man DV course. Man 2 Man was particularly relevant in light of the magistrate judge's finding that social worker Henderson had determined that M.W.'s behavior toward M.G. suggested that he should receive a DV assessment and treatment to ensure that he would not expose Z.W. to violence in the home.[36] Additionally, as noted above, M.W. was free to discuss any desired change to the plan requirements with the social workers, but he chose not to engage in the case-planning process.[37]

In sum, the trial court's ruling that the government provided a reasonable plan for reunification was well-reasoned, informed by relevant factors, and supported by facts in the record. We find no abuse of the trial court's broad discretion and will not disturb the ruling on appeal.

---

[36] In his brief, M.W. asserts that the requirement to attend Man 2 Man was inherently inappropriate, as this program was recommended by a CFSA employee who M.W. alleges is a convicted murderer and has been subjected to professional discipline. The government responds that M.W. has waived this argument because he failed to raise it in the trial court. The government also correctly notes that, in any event, social worker Henderson independently recommended that M.W. attend the program; thus, it is immaterial that the other CFSA employee recommended it as well. Accordingly, we do not address this assertion further.

[37] *See In re K.C.*, 200 A.3d at 1237 ("Had [the parent] desired a better tailored or more responsive plan, she was certainly free to collaborate with the [a]gency on this – but she did not.").

**B. Reasonable Efforts**

M.W. next argues that the agency did not make "reasonable efforts" to reunify the family. This contention has no merit. As we have observed, the social workers' (credited) testimonies indicated that, over the life of the case, they made extensive efforts toward reunification. M.W., however, was inconsistent in maintaining contact with them, in complying with the required services, and in showing up for visits with Z.W. and for his speech therapy sessions. That the agency made the required reasonable efforts is bolstered by other evidence in the record, including the magistrate judge's disposition and disposition review orders, which were admitted in evidence at the permanency hearing. All three orders included findings that the agency had made reasonable efforts during the period under review. And, as the reviewing judge noted, M.W. did not dispute these factual findings; he contended only that the agency should have done even more than it did.

The agency, of course, could always have done more if it had unlimited time and resources, and there undoubtedly is room for improvement in its practices and performance. But we defer to the factfinder's credibility determinations, and, as explained in the court's opinion, the magistrate judge credited the testimonies of

the social workers.  The testimonies then informed factual findings – which were undisputed by M.W. – demonstrating that the inadequacy of effort was on M.W.'s side, not on the agency's.[38]

With this background in mind, we review M.W.'s two substantive contentions on appeal discounting the trial court's finding that CFSA made "reasonable efforts" to assist in reunification.

*First*, he asserts that the agency should have referred him to a DV program other than Man 2 Man because he felt that it was not a good fit for him.[39]  At the permanency hearing, Henderson testified that M.W. had attended the first two classes and initially said that he enjoyed the program and was learning from it – indeed, M.W.'s counsel stated at the May 2017 hearing that M.W. "like[d]" the Man 2 Man course – but that M.W. later stopped attending because he had decided it was no longer right for him, apparently because he felt that it was for physically abusive men and that he did not fall into that category.  M.W.'s own testimony was

---

[38]    *See In re K.C.*, 200 A.3d at 1237 & n.14 (discussing the parent's uncooperativeness and concluding that, "[i]f there was a failure to make reasonable efforts, it appears to have been on [the parent's] part, not the [a]gency's part").

[39]    M.W. also repeats, in connection with Man 2 Man, his assertions regarding the CFSA employee who he alleges was convicted of murder and subjected to professional discipline.  See *supra* note 36.

consistent with this assertion. Domestic violence, however, may take forms other than physical violence,[40] and it does not appear that M.W. disputed, either in the trial court or on appeal, the social worker's assertions, credited by the factfinder, regarding M.W.'s treatment of M.G., which could raise DV concerns. Moreover, there was no evidence that the Man 2 Man course was limited to, or even specifically intended for, men who are physically abusive. In fact, there was no indication that the course was unsuitable for M.W. in any way.

M.W.'s feeling that the class was not well-suited to him was not a compelling reason to obtain a referral to a different service provider. He did not indicate that there was a conflict with his work schedule, a transportation issue, or some other legitimate barrier to attendance. Instead, he simply decided not to attend. Furthermore, the social worker testified that Man 2 Man was the only DV course that CFSA had available at that time, and the court itself, in two of its hearing orders, had specifically ordered him to complete that particular course. M.W. thus had every reason to persevere. One would think that a parent who was

---

[40] *See, e.g.*, National Domestic Violence Hotline, "What is Domestic Violence?," retrieved from https://www.thehotline.org/is-this-abuse/abuse-defined ("Domestic violence includes . . . emotional abuse and economic deprivation."); National Coalition Against Domestic Violence, "Learn More," retrieved from https://ncadv.org/learn-more ("It is important to note that domestic violence does not always manifest as physical abuse" and may manifest as "[e]motional and psychological abuse.").

serious about reunifying with his child would do what it takes to complete an agency-referred and court-ordered course,[41] whether or not it was, in his view, the best class for him. In short, in the absence of any evidence that attending Man 2 Man was legitimately inappropriate or even simply unduly burdensome, M.W. has raised no serious argument that CFSA's failure to refer him to (apparently non-existent) alternative DV programs undermined the reasonableness of the government's efforts.

*Second*, M.W. asserts that the agency did not do enough to "facilitate" drug testing for him early on, i.e., between January and May 2017, and that the court did not order drug assessment or treatment early enough because, as explained above[42] and discussed further below, the APRA assessment was not ordered until September 2017.

M.W. does not explain what "facilitation" he was seeking, and there is no indication in the record that he communicated to the agency any confusion or difficulty. For example, as mentioned earlier, M.W. was first ordered to spot test

_____

[41] M.W. himself testified that he knew that the court ordered him to attend the Man 2 Man course.

[42] See *supra* section I.B.4 and note 35.

at the January 13, 2017 hearing, at which he was personally present. He could have gone directly from the hearing to the testing facility in the courthouse, as ordered, but he did not. There was no indication that M.W. faced any impediment to testing that day, or on any other day. Thus, short of personally, physically escorting M.W. to each mandated drug test, it is unclear what agency staff could have done to ensure his compliance.

Nor did M.W. request any assistance or accommodation with respect to drug testing or treatment. For instance, the magistrate judge found that social worker Sherman had spoken with M.W. to remind him to do drug testing and participate in an APRA assessment, but, "[d]espite their frequent communications, [M.W.] never asked [] Sherman for any assistance." Quite the opposite, in fact: in January 2017, M.W. told social worker Henderson that he did not use drugs, and, at the May 2017 hearing, his counsel represented to the court that M.W. did not use drugs and did not need testing. Still, the social workers' testimonies, credited by the factfinder, were that, throughout the life of the case, they reminded M.W. of the court-ordered services (including drug testing), made referrals to drug rehabilitation programs, and urged him to comply. At the December 2017 goal change hearing, M.W. finally admitted his drug use, but, as noted, his progress on drug treatment by that point was insufficient.

Under these circumstances, it is difficult to see what more the agency could have been reasonably expected to do.  Indeed, M.W. does not offer any concrete suggestion as to what more the agency could or should have done.  And, as we have recently observed, "the reasonable efforts standard does not burden the agency with the additional responsibility of holding the hand of a recalcitrant parent."[43]  As noted,[44] when a child is placed in foster care, the trial court must hold a permanency hearing within twelve months – a period of time that may not seem particularly lengthy to adults but is quite significant in the life of a small child.  This timeframe imposes an urgency on the government to pursue its efforts with dispatch and on the parents to engage and cooperate promptly.  M.W. was on notice of this timeframe and its accompanying urgency, as the magistrate judge's January 2017 order contained an explicit warning that notified the parents that a permanency hearing – at which Z.W.'s permanency goal could be changed from reunification to adoption – would be held on December 4, 2017.[45]  It appears that the agency took significant action during this timeframe, but, as discussed below,

---

[43] *In re J.M.*, 193 A.3d at 785 (citation and internal quotation marks omitted); *see also In re A.I.,* 211 A.3d at 1128 ("'Reasonable efforts' is determined by an examination of the agency's efforts not the parent's compliance").

[44] See *supra* section II.

[45] See *supra* note 5.

M.W. ultimately did not complete the steps he was required to take during that period.

Accordingly, the trial court's finding that the agency had made "reasonable efforts" was supported by a firm factual foundation and fell within a range of permissible alternatives. We find no abuse of discretion.

## C. Adequate Progress

M.W. next asserts that the trial court erred in determining that he did not make adequate progress toward reunification. He argues that he made progress by completing a parenting class with an anger management component, completing a DV assessment, engaging in visitation with Z.W., and beginning an outpatient drug treatment program. With respect to drug use in particular, he contends that the initial neglect finding was not based on substance abuse, and that there is no evidence that his drug use impacted his ability to care for Z.W.[46] He also contends

---

[46] M.W. also asserts that he has maintained housing and employment since the inception of the case, and that his ability to do so was evidence of progress. But housing and employment were not relevant factors in this case, as they were not addressed by the court, either in the context of the neglect stipulation and finding or in any of the periodic hearings, and M.W.'s housing and employment status were never disputed by the government. We note, nonetheless, that it

(continued . . . )

that his progress was sufficient because *Ta.L.* requires only "fair progress," which he characterizes as "a floor, which a parent must not stoop beneath, not the ceiling we hope them to achieve."

As discussed above, Magistrate Judge Breslow, in her permanency goal change decision, made detailed findings that M.W.'s progress was inadequate due primarily to his continuing positive drug tests and his failure to complete drug treatment, his failure to complete the Man 2 Man program, and his failure to visit Z.W. regularly. Her factual findings were based on the testimonies of the social workers, the drug test results (which were admitted in evidence at the permanency hearing), and M.W.'s impairment during the hearing. Relying on these findings, she concluded that M.W.'s progress was inadequate. That conclusion is further supported by the judge's order from the September 2017 disposition review hearing, which was admitted in evidence at the permanency hearing, and which included findings that M.W. had not made progress on the reunification plan based

_____
( . . . continued)
appears that M.W. did not, in fact, maintain employment throughout the neglect matter; while the agency's disposition reports were not admitted in evidence at the permanency hearing, these reports indicate that M.W. told agency staff both in January 2017 and in May 2017 that he was not employed but performed odd jobs. He then told agency staff in August 2017 that he had recently become employed.

on the same three deficiencies: drug testing/treatment, the DV course, and visitation.

On review, Judge Wellner noted that M.W. did not dispute the magistrate judge's factual findings that M.W. had failed to make progress in certain key areas; he rejected M.W.'s legal argument that he had satisfied an adequate progress "floor"; and, finally, he concluded that the magistrate judge did not err in determining that M.W.'s progress on the reunification plan was inadequate.

We reject out of hand M.W.'s assertion – which he repeats on appeal, again without offering any legal support – that *Ta.L.* requires only that parents not fall beneath a "fair progress" "floor." Under our case law, the government must prove "that the parents have failed to make *adequate* progress towards satisfying the requirements of [the reunification] plan,"[47] and there is no indication in *Ta.L.* or elsewhere that the standard is as low, or the review as minimal, as M.W. urges.

This brings us to M.W.'s fallback argument that his progress was, in fact, adequate, even according to a meaningful adequate progress standard. The trial court's decisions acknowledge that M.W. completed a parenting course, which

---

[47] *In re Ta.L.*, 149 A.3d at 1078 (emphasis added).

contained an anger management component, and also DV and APRA assessments. Those requirements of the plan, therefore, were satisfied. We thus are left with determining whether the trial court abused its discretion in concluding that M.W.'s failure to fulfill the remaining requirements – drug testing and treatment, visitation with Z.W. and participation in Z.W.'s speech therapy, and completion of the DV course – supported a finding, by a preponderance of the evidence, that M.W.'s progress toward reunification was not "adequate."

*First*, as discussed above with respect to drug testing and treatment, the magistrate judge ordered drug testing at the January 2017 hearing, but M.W. complied only belatedly and episodically – and only after the court again ordered drug testing at the May 2017 hearing.[48] Furthermore, the four tests he completed (in May and June 2017) established that he was using drugs, as they were all positive for cocaine and marijuana. At the September 2017 hearing, therefore, the court ordered M.W. to undergo an APRA assessment and any recommended treatment. The parties do not dispute that, at some point after the September 2017 hearing and order, M.W. completed the APRA assessment and began an outpatient treatment program; and, at the December 2017 permanency hearing, M.W. testified

_____

[48] Indeed, M.W. himself testified at the permanency hearing in December 2017 that, at some point, he had "just stopped" testing.

that he had been attending the program for approximately six weeks.[49] Nonetheless, of the seven tests he completed in October and November 2017, all were positive for cocaine and two were positive for marijuana, except for one test in November that was negative for both – although the explanation of that test result notes that the "[v]alues . . . may indicate water-loading."[50] Furthermore, M.W. was impaired at the December 2017 permanency hearing, which was readily apparent to the magistrate judge from his appearance and demeanor, and was then confirmed by the drug test she ordered for him that day, which showed that he was

_____

[49] In her permanency goal change order, the magistrate judge said that M.W. "did not provide [social worker] Sherman with any proof that he did actually beg[i]n drug treatment," that he "provided no documentation" to show "that he was getting treatment at Harbor Lights," and there was "no proof of engagement in drug treatment." However, it appears that the government has never disputed, either in the trial court or on appeal, that M.W. enrolled in the Harbor Lights drug treatment program. And social worker Byrom testified that she had confirmed he was attending. Thus, the issue is not whether M.W. ultimately began drug treatment but, rather, what its result was.

[50] *See*, *e.g.*, Substance Abuse and Mental Health Services Administration, *Treatment Improvement Protocol (TIP) Series, No. 47: Substance Abuse: Clinical Issues in Intensive Outpatient Treatment: Appendix B. Urine Collection and Testing Procedures and Alternative Methods for Monitoring Drug Use* (2006), available at https://www.ncbi.nlm.nih.gov/books/NBK64092 (discussing methods for determining whether a drug testing subject has consumed excessive fluids prior to a drug test in order to make the drugs in his or her system less detectable).

under the influence of both cocaine and marijuana.[51]  Thus, M.W.'s progress on this front appeared to be negligible at best.

M.W. nonetheless contends that, because his substance abuse was not the reason for the neglect finding or the removal of Z.W. from the home, the court should not have considered it when evaluating his progress under the reunification plan.  And yet, as M.W. himself argues, the reunification plan can and should evolve when appropriate.  That is exactly what happened here.  As discussed above in the context of the plan's reasonableness, adding a drug testing and treatment element was an appropriate and reasonable evolution of the plan.  The record clearly shows that M.W. did not fulfill this requirement.

*Second*, as to visitation and speech therapy, the magistrate judge made factual findings, based on the credited testimony of the social workers, that M.W. had been inconsistent and unreliable in his visitation with Z.W. and in his participation in Z.W.'s speech therapy.  As the reviewing judge pointed out, M.W.

---

[51]  M.W.'s assertion at the permanency hearing that he would stop using drugs if Z.W. were in his care because Z.W. would keep M.W.'s mind off of drugs was also troubling, as it suggests a lack of appreciation for the gravity of the problem and the seriousness of the efforts required to remedy it.  Indeed, the magistrate judge commented:  "I was really struck by [M.W.'s] comment that having [Z.W.] would keep him clean because that is one heck of a heavy burden to put on a 2-year-old."

"does not dispute that he failed to visit [Z.W.] *regularly*, noting instead that he did make some visits to see his son." Thus, the record establishes that M.W. failed to engage in consistent and reliable visitation, and failed to meaningfully participate in Z.W.'s speech therapy, thereby demonstrating a lack of compliance with this dimension of the reunification plan.

*Third*, with respect to the DV course, as discussed above, it is undisputed that M.W. completed the DV assessment; that the Man 2 Man course was recommended both as a result of that assessment and independently by one of the social workers; that this course was ordered by the court; and that M.W. began but did not finish it. As explained in the context of the reasonable efforts analysis,[52] M.W. offered no persuasive reason for not completing Man 2 Man, particularly because he had almost one year to do so. The court had ordered him in January 2017 to complete the DV assessment and follow its recommendations, and the court specifically ordered him to complete the Man 2 Man course in May 2017 and September 2017. M.W. still had not completed Man 2 Man by December 2017. He therefore did not fulfil this requirement of the plan.[53]

_____

[52] See *supra* section III.B.

[53] M.W. asserts on appeal that he did not need to take the DV course seriously because the agency and the court did not take DV seriously, as evidenced

(continued . . . )

In sum, the record shows that M.W. complied with some plan requirements but failed to comply with others. Thus, we must evaluate whether the trial court abused its discretion in ruling that his progress, on the whole, was inadequate. While adequacy is not defined in our case law, an evaluation of "adequate progress" – which bears on whether a parent can care for a child in a safe and healthy way[54] – is undoubtedly a fact-bound inquiry that must be conducted on a case-by-case basis. Indeed, in neglect cases, trial judges have always assessed the adequacy of biological parents' progress when determining whether to change a child's permanency goal from reunification to adoption. Since our decision in *Ta.L.*, trial courts have been required to hold an evidentiary hearing and make findings that explicitly address four elements of the neglect proceedings, including

_____

( . . . continued)

by the agency's allowing M.W. and M.G. to visit with Z.W. together during the first several months of the case. This makes little sense. At each quarterly hearing, the court ordered supervised visitation, meaning an agency staff member or designee supervised any visits that M.W. and M.G. had together, and was therefore present to ensure that their interactions in front of Z.W. were appropriate. The DV course was intended to help M.W. learn to engage appropriately with M.G. and others *without* supervision so that, if he was reunified with Z.W., there would be no risk of exposing Z.W. to DV in the home. In addition, beginning in May 2017, the magistrate judge ordered that the parents visit with Z.W. separately because of the volatility of their relationship.

[54] *See In re A.I.*, 211 A.3d at 1128 ("Where the record reflects that the parent has not made 'progress that would be required for her to safely and effectively meet [the child's] needs,' it cannot be said that the parent has made 'adequate progress' towards reunification." (quoting *In re K.C.*, 200 A.3d at 1238)).

the adequacy of the parents' progress in satisfying the requirements of the reunification plan.[55]

In this case, we do not discount the efforts that M.W. made – completing the parenting course with an anger management component, the DV assessment, and the drug assessment – and we credit him with fulfilling these requirements of the plan. As explained above, however, the record shows significant shortcomings. M.W. did not timely or fully comply with drug testing requirements or complete a drug treatment program, and his continued use of drugs – as illustrated by his presentation and failed drug test on the day of the permanency goal hearing – raises grave concerns regarding his ability to properly care for Z.W. The inconsistency of M.W.'s visitation with Z.W. is likewise concerning, given that visitation is obviously a critical component of a parent's efforts to maintain a relationship with his or her child,[56] and M.W.'s lack of meaningful participation in Z.W.'s speech therapy indicates a lack of commitment to supporting the boy's cognitive and behavioral development – deprivations of particular significance

_____

[55] See *supra* section II.

[56] *See, e.g.*, *In re Ko.W.*, 774 A.2d at 304 (visitation is an important part of a parent's right to develop a relationship with the child); *see also In re J.M.*, 193 A.3d at 786 & n.15 (failure to visit children consistently was a significant factor in the court's finding that a parent did not make adequate progress toward the goal of reunification).

given Z.W.'s young age. Indeed, drug treatment and visitation were vital elements of the plan, as they went directly to M.W.'s ability to be a responsible and loving caregiver, and thus we give substantial weight to M.W.'s failure to comply with these dimensions of the plan. Finally, for no good reason that we can discern, M.W. refused to complete the DV course he was ordered to complete, which indicates a lack of concern about the DV issue, as well as the absence of serious effort to comply with the agency's referrals and the court's orders. Taken together, these failures are substantive, significant, and sufficient to demonstrate a lack of adequate progress toward fulfilling the requirements of the reunification plan.

Accordingly, the trial court's reasoned decision that M.W. failed to make adequate progress toward satisfying the requirements of the reunification plan was drawn from a firm factual foundation, was determined by reference to all proper factors and no improper factors, and was supported a preponderance of the evidence. We perceive no abuse of discretion with respect to this element of the analysis.

## D. Alternatives to the Termination of Parental Rights

We turn to the fourth and final *Ta.L.* factor. M.W. argues that CFSA did not

adequately explore other options for avoiding termination of his parental rights, including kinship placements, because it did not hold a formal meeting on this topic after Z.W. was moved from his paternal aunt's home in November 2017, and further because the agency did not explore guardianship prior to seeking a goal change to adoption.

As discussed above, the reviewing judge observed that the magistrate judge made factual findings – which M.W. did not dispute – that CFSA did explore kinship options, including a successful placement with B.W., M.W.'s own sister (Z.W.'s paternal aunt). Still, M.W. argues that the agency should have explored additional relatives after B.W disrupted Z.W.'s placement with her. He offers no factual or legal support for this argument, however, nor does he assert that he suggested additional relatives to the agency for exploration at that time. Furthermore, the reviewing judge observed that a governing statute provides that a court may not order guardianship unless it finds adoption to be inappropriate,[57] and that here the magistrate judge found that adoption was appropriate for Z.W. M.W. offers no rationale for why guardianship would have been appropriate, let alone more appropriate, than adoption in this case. He likewise fails to offer any

---

[57] D.C. Code § 16-2383(c)(2) (2012 Repl.); *see also* Super. Ct. Neg. R. 34(e).

evidence that he requested the agency or the court to consider guardianship, or that he proffered possibilities for potential guardians for Z.W. He has therefore failed to raise any serious argument that the trial court erred with respect to this factor.[58]

The magistrate and reviewing judges concluded that a preponderance of the evidence established that the government adequately explored alternatives to TPR, including kinship placements. These judges rested their conclusions upon facts of record; they considered the correct legal principles; and they exercised their discretion appropriately. Hence, we do not disturb that joint conclusion.

## IV. Conclusion

For the foregoing reasons, we conclude that the trial court acted within its discretion when changing Z.W.'s permanency goal from reunification to adoption. We therefore affirm the judgment.

*So ordered*.

---

[58] We note that the guardianship provisions of the D.C. Code are extensive, *see* D.C. Code §§ 16-2381–2399, and we do not pass upon the requirements of guardianship determinations or their interactions with the fourth *Ta.L.* criterion. Rather, we conclude only that M.W. did not meaningfully challenge the trial court's determination that the agency adequately explored alternatives to TPR.

FERREN, *Senior Judge*, with whom GLICKMAN, *Associate Judge*, joins, concurring: I join the court's opinion and write separately only to address the issue of hearsay evidence in neglect proceedings. This issue was not briefed by the parties, but was raised at oral argument, where counsel for the government noted that some judges have ruled that hearsay evidence is inadmissible at permanency hearings in which the trial court considers the government's request for a goal change. In this case, it is apparent from the transcript of December 2017 permanency hearing that the magistrate judge sustained hearsay objections or permitted perceived hearsay testimony only for purposes other than the truth of the matter asserted.

While it may be true that some magistrate judges disallow hearsay at permanency hearings, it is not clear why. To the contrary, this court has said that hearsay evidence is admissible in such hearings. In *In re D.B.*, we considered the "many different proceedings throughout the neglect process, including dispositional hearings, disposition review hearings, and permanency and permanency review hearings," and, in examining relevant statutes and rules, we concluded that "[h]earsay is admissible in such hearings."[1] Hearsay evidence must

_____

[1] *In re D.B.*, 947 A.2d 443, 447-48 (D.C. 2008). As mentioned in note 2 of the court's opinion, *ante* at 3, once a child has been adjudicated neglected and a

(continued . . . )

be material and relevant, and there must be safeguards to assure that biological

parents have the opportunity to rebut such evidence.[2] But there does not appear to

be a per se bar to the admission of hearsay in these hearings.[3]

_____

( . . . continued)

disposition order has been entered, the trial court holds disposition review hearings at least every six months, unless a permanency hearing has been held within the past six months. *See* D.C. Code § 16-2323(a)-(b) (2012 Repl.); D.C. Super Ct. Neg. R. 28, 30. The trial court holds a permanency hearing within twelve months after the child's entry into foster care and at least every six months thereafter, "for as long as the child remains in an out-of-home placement." D.C. Code § 16-2323(a)(4); *see also* D.C. Code § 16-2323(b)-(f); D.C. Super Ct. Neg. R. 28, 30. A permanency goal change from reunification to adoption is generally made at the first permanency hearing, *see In re Ta.L.*, 149 A.3d 1060, 1077-78 (D.C. 2016) (en banc), and permanency hearings are held periodically thereafter to review the permanency goal.

It is important to add, for clarity, that disposition, disposition review, permanency, and permanency review hearings held in the context of neglect proceedings are distinguishable from fact-finding hearings held to determine whether neglect occurred in the first instance. We have said that hearsay evidence cannot be admitted over proper objection in such fact-finding hearings unless it comes under a valid hearsay exception. *See, e.g.*, *In re M.F.*, 55 A.3d 373, 378 (D.C. 2012); *In re Ty.B.*, 878 A.2d 1255, 1263-65 (D.C. 2005); *In re Ca.S.*, 828 A.2d 184, 189-92 (D.C. 2003). No such hearing occurred in this case, as M.W. (and M.G.) stipulated to neglect.

[2] *In re D.B.*, 947 A.2d at 448 (citing D.C. Code § 16-2316(b) (2001), which states that "[e]vidence which is material and relevant shall be admissible at . . . dispositional hearings," and further noting that "[o]ur opinion in *Ko.W.*[, 774 A.2d 296, 303 (D.C. 2001),] apparently contemplates that hearsay evidence will be admitted, but it stresses that there must be adequate safeguards to ensure that the parent has the opportunity to rebut it." (footnote omitted)).

In fact, the Child and Family Services Agency ("CFSA" or "the agency") must, by law, file reports for disposition-related and permanency-related hearings that presumably contain hearsay.[4]  Indeed, these reports almost necessarily contain hearsay because it would be impossible for an agency staffer to personally accompany a parent, or parent and child, to every test, assessment, appointment, and the like.  The agency's reports on the parents' and children's status and progress *must* incorporate information communicated to agency staff by doctors, therapists, teachers, administrators, and other service providers and professionals. And these agency reports, which either implicitly or explicitly rely on hearsay, inform the trial court's orders that are issued at the periodic hearings – orders that may then be admitted in evidence at the permanency hearing.  Likewise, the testimony of agency staff at a permanency hearing almost certainly relies upon the information contained in the agency reports and other information of a similar nature, even when the testimony may not appear to be hearsay because the testifier

_____

( . . . continued)

[3]  *Id*. at 448 ("Appellant has not identified, and we have not found, any statute or rule that prohibited the admission of hearsay in the proceedings under review.").

[4]  *See id.* (noting that D.C. Code § 16-2323(d) "require[s] [the] agency, in preparation for a disposition review hearing or permanency hearing, to submit to the court a report that addresses, among other things, '[t]he extent to which visitation has occurred[,]' and that contains information that the agency presumably will derive from third party statements"); *see also* D.C. Code § 16-2319 (2012 Repl.); Super. Ct. Neg. R. 21, 28, 29, 30, 32-34.

only relies upon this information implicitly. Therefore, a legal fiction is invoked to assert that hearsay testimony is not permitted at permanency hearings.

During the life of a neglect case, documents that are filed with the court, such as the agency's disposition reports and permanency reports, are reviewed by the magistrate judge and inform the magistrate judge's orders at the initial hearing, disposition hearing, and disposition review hearings. These hearing orders then inform the permanency goal change decision, at least indirectly, and also directly if they are admitted in evidence at the permanency hearing. Both the agency's reports and the magistrate judge's orders are then included in the record, which is before the reviewing associate judge and is then before this court on appeal. Accordingly, in seeking to conduct a proper and thorough review of such cases, it seems entirely appropriate for this court to review these documents, in order to ensure that the trial court's rulings rest on firm factual foundations and are supported by preponderant evidence.

In *Ta.L.*, however, the en banc court flagged an important concern. We observed that, although an agency report, unsupported by testimony, "may be sufficient for a typical neglect review hearing, it does not pass due process muster when the rights at stake are as great as a parent's constitutional right to raise his or

her child."[5]   The problem has been, we said, that, in making permanency goal change decisions, "trial courts are routinely presented with information contained in the government's permanency report *without any testimony* from those who provided the information on which the government's recommendations are based or any other evidence that undergirds the findings and/or conclusions found in those reports."[6]   Since *Ta.L.*, therefore, the "more formal hearing[s]"[7] that have been convened to decide permanency goal changes have provided a forum in which social workers and other service providers and professionals must now testify under oath and be subjected to cross-examination about any agency report or other document offered in evidence.   Thus, disposition reports, permanency reports, and similar documents prepared by these individuals and considered by the court in permanency hearings should not implicate the due process concerns raised by *Ta.L.* The live testimony offers the parents an opportunity to confront these witnesses, and thus offers the court an opportunity to observe the demeanor of each witness and make credibility determinations. These determinations can then be used to assess the reliability of any hearsay evidence that may be contained in the testimony or in the documents on which a witness relies.

_____

[5]  *In re Ta.L.*, 149 A.3d at 1076.

[6]  *Id*. (emphasis added).

[7]  *Id*. at 1078.

Accordingly, to the extent that biological parents wish to challenge the contents of agency reports or other documents, or the testimonies of the social workers who prepared them – or any other evidence that is before the trial court – they may do so at the "more formal" permanency hearing.[8] These permanency hearings, therefore, are now more formal than they were before the issuance of *Ta.L.*, and they are likely to be more formal than other kinds of hearings during the life of a neglect case, such as disposition, disposition review, and permanency review hearings, which continue to be rather informal. This does not necessarily mean, however, that hearsay evidence should not be permitted at these more formal permanency hearings.[9]

In sum, while permanency hearings in which goal changes are considered now involve formal elements, such as sworn testimony and the creation of

_____

[8] *Id.* at 1079 (one purpose of "a more formal hearing" is to allow the parents an opportunity to rebut the government's evidence and present their own evidence).

[9] Our decision in *D.B.*, discussed above, which clarified that hearsay was admissible in disposition, disposition review, permanency, and permanency review hearings, was issued in 2008. *In re D.B.*, 947 A.2d at 447-48. This was, of course, several years before the court's en banc decision in *Ta.L.* in 2016, which mandated "more formal hearings" for permanency goal change decisions. *In re Ta.L.*, 149 A.3d at 1078. Nonetheless, for the reasons expressed here, hearsay should be admissible at hearings on permanency goal changes, even post-*Ta.L.*

transcripts – elements that are typically absent in other kinds of hearings in a neglect case[10] – there appears to be no inherent need or logic that mandates excluding hearsay. Indeed, family court proceedings are generally flexible, affording latitude and discretion to the trial court, and the court can safeguard the right of biological parents to a meaningful evidentiary hearing without resort to overly formalistic or rigid constraints that will restrict the quantity and quality of relevant evidence that can be admitted.[11] The magistrate judge as factfinder may accord greater or lesser weight to various kinds of evidence based upon indicia of reliability, but I find no support in the law for the notion that hearsay evidence is inadmissible in permanency hearings.

---

[10] This includes disposition, disposition review, and permanency review hearings, but not fact-finding hearings to determine whether neglect occurred. See *supra* note 1.

[11] *See, e.g.*, *In re Ta.L.*, 149 A.3d at 1104 n.65 (Glickman, J., concurring and dissenting) (noting that "parents have a right to an evidentiary hearing at which they may cross-examine adverse witnesses and present their own evidence if they wish to contest the material factual allegations supporting the CFSA's decision to seek a goal change," while also noting that "courts in other jurisdictions have held that the rules of evidence are relaxed at permanency hearings. *See, e.g.*, *In re Ashley E.*, 387 Md. 260, 874 A.2d 998, 1018 & 1018 n.19 (Md. 2005).").

EASTERLY, *Associate Judge*, concurring dubitante:   In an opinion far longer than either of the trial court orders on review, this court upholds the permanency goal change from reunification of Z.W. with his father to adoption.   The opinion contains a significant amount of extraneous information about informal disposition hearings, predicate court orders, and unfiled documents that have no bearing on the central issue in this case:   whether the government carried its burden at the permanency goal change hearing to establish that the goal should be changed from reunification of the child with his parents to adoption.  *In re Ta.L.*, 149 A.3d 1060, 1078 (D.C. 2016) (en banc) (explaining that "due process requires a more formal hearing than has been afforded to parents in the past" at which "the government must produce sufficient evidence from which a trial court can find by a preponderance of the evidence that the presumption in favor of reunification has been rebutted").   These drafting choices are in tension with our obligation to "conduct a meaningful review of the trial court's permanency decision" "[b]ased on the evidence presented at the hearing," *id.* at 1079, and it diverts from the government's failure—undisputed at trial and on appeal—to present documentary evidence of its case planning efforts, the threshold showing for such a permanency goal change.  *Id.* at 1078 (explaining that the first showing the government must make by a preponderance of the evidence at a permanency goal change hearing is "that it has provided the parents with a reasonable plan for achieving

reunification"); *In re A.I.*, 211 A.3d 1116, 1124–25 (D.C. 2019) (explaining that the agency's case plan must be drafted by the agency, memorialized in writing, and fulfill certain statutory and regulatory requirements); *see also id.* at 1129 (confirming on appeal that the agency's case plan "fulfilled DC ASFA's[1] requirement that the case plan be a written plan for assuring that the child receives safe and proper care and that services are available to the parents, child, and foster parents in order to improve conditions in the parents' home" noting that it was "an extensive document that detail[ed], among other things, a problem statement, a vision of success, and action components for each domain in the case and for each participant in the case" (citing D.C. Code § 4-1301.02(3)(B)) (internal quotation marks omitted)). Indeed, the opinion never squarely states that the magistrate judge was wrong to conclude that its own orders were an adequate substitute for the agency's written case planning or that the reviewing associate court judge was wrong to conclude that a written case plan was not in fact required. After *In re A.I.* it is clear, however, that the Child and Family Services Agency must engage in substantive case planning and memorialize those efforts in writing. We acknowledge that *In re A.I.* is binding precedent. *Ante* at 31 n.29. Accordingly, the scenario we confront in this case should not reoccur.

---

[1] Adoption and Safe Families Amendment Act, D.C. Code §§ 4-1301 *et seq.* (2019 Repl.)

Effectively, we resolve this case on harmlessness grounds. (As *In re Ta.L.*, 149 A.3d at 1078, and *In re A.I.*, 211 A.3d at 1128, make clear, the threshold case planning requirement is the foundation for any downstream assessment of the agency's reasonable efforts and the parent's progress.) We require CFSA to engage in case planning and make reasonable efforts to support parents in reunifying with their children precisely because parents whose children have been removed from their custody generally "fac[e] serious challenges and lack[] robust support systems," *Ta.L.*, 149 A.3d at 1080; *accord In re J.M.*, 193 A.3d 773, 783 (D.C. 2018) (acknowledging "the obvious": parents in this category "need assistance" and generally are "not proactive"). Yet we conclude in this instance that even if the agency had done what it should have, it would not have made a difference. We do so without asking the parties to brief whether the failure to present evidence of a written case plan at a permanency goal change hearing can be subject to a harmlessness analysis, and without explaining by what measure we assess the absence of harm. But neither party has requested supplemental briefing in the wake of *In re A.I.*, which was published after oral argument in this case, and I understand the desire to achieve closure for the child in this case.